The first case, United States of America v. Patrick Killen. Good morning. May it please the court. Federal law mandates that in a criminal case, a sentencing court shall impose a sentence that is sufficient but not greater than necessary to meet the federal goals of sentencing. Fortunately, in this case, we had a district court that imposed a sentence that went far beyond what was necessary to meet those goals. It was a shocking sentence that served no just purpose. It's a substantively unreasonable sentence. We're asking this court to vacate it and to remand it to a district court judge, which is a request that we don't make lightly. And certainly there were some clear procedural errors as well that make it procedurally unreasonable, but it's that substantive unreasonableness that really jumps out in this case. Mr. Lopez, what were, if all the sentences were, or most of them were to have run concurrently, what was his advisory guideline range? Well, those are actually two things, Your Honor. I mean the advisory guideline range as calculated by the district court was life. No, no, I know, but that's because the sentences were run in a certain way. Yes, sir. So I'm asking you under your version of the case, right, because you believe that at least most if not all of the sentences should have been run concurrently. Yes, sir. And that's one of the things you think led the district court into imposing an unreasonable sentence. So my question to you is under your version of the way the sentence should have been structured, what was the advisory guideline range? Well, there were three offenses that had statutory ranges of 15 to 30 years. If all the sentences were to run concurrently, then those would have really, under 3584 and under 5G1.2, those really would have been the ones that controlled the sentencing. But there are times when even if sentences are run, well, there are times when an advisory guideline range exceeds the top maximum sentence available for one of a multi-count case, and in that case, at the very least, the guidelines certainly envision a district court running one of the other counts consecutive to reach the advisory guideline range. That's a permissible way of doing things, right? That is correct, Your Honor. But here you're telling me that if those 15 to 30-year sentences were run concurrently, his guideline range would have been within 15 to 30 years? Again, Your Honor, I think they're two separate things. So if the district court goes through the sentencing guidelines calculation, comes up offense level 43, criminal history one, that's a life sentence, and then goes through the 5G1.2 steps and the 3584, taking it all into account, and 5G1.2 sub D really kind of spells it out for the district court what it's supposed to do. The first thing it's supposed to do is to set up a specific sentence, which the district court didn't do initially. Then you look at the sentences. How many do I have to run consecutively? And it tells you 5G1.2. You start out with the sentence that carries the highest mandatory sentence, 30 years. That's one, three, and five had a 15 to 30. Is 30 years enough? Okay, it isn't. We haven't gotten to the life range. If I want to sentence him to the life range, now we get three. One and three run concurrent. Those are now 30 and 30 at 60. Is that not enough? Does that not put you into the life range? No, then you do one, three, and five. I think that's the question that's being asked here. I think the question is if the sentences were to run concurrently and the guidelines were interpreted in that way, what would the guideline range be? And what would the sentence from that, what could the sentence be? Again, I think there are two different things. One of them is the calculation of what the range is under the sentencing guidelines. And then one of them is the next step then would be to determine a sentence. And under 5G 1.2, then how do you get to that sentence given the statutory maximum? I agree with you that those are two separate things. But I think your answer to my first question was that he faced, even under your version of the case, an advisory range of life. Is that accurate or not accurate? Well, we would still challenge, and we do in our briefs, the calculation that led to that life. In other words, the offense level shouldn't have been. That's why I'm asking you under your version of the case, what is his advisory guideline range? Under the best of circumstances, you win on every guideline issue. What's his advisory guideline range? At worst, it would have been 36 to life, which are the next two lower ranges. 360 to life. 360 to life, yes. Okay. So, step one, the sentence that is imposed, if you are correct, the advisory range is 30 years to life imprisonment. And now, if you are correct about that, we have to figure out whether or not the sentence that was actually imposed was substantively reasonable or unreasonable. That's correct. Okay. Go ahead. My only question is, can you tell me precisely what the age was when the defendant started his criminal activity and finished his criminal activity? Yes. I think at one point the government makes mention of being 16 when he started. I don't know if there was any evidence that actually supported that. He was at least 19 when he started. So, 18, 19 when he started, 20 when he finished. February 2014, when the agents came in, he was 20. There was evidence, was there not, that he was emotionally and psychologically immature? Yes, sir. And what was that? That was from his parents? There was also some expert, and at the sentencing there was more of an allusion to that. But there was also a factual finding by the magistrate judge during the evidentiary hearing. She made a factual finding that she found the defendant to be immature. Yeah. He spent the first three and a half years of his life in a Romanian orphanage. Yes, tied down to a crib. And he was tied down to a crib for three and a half years to the point where his wrists were, there was markings on his wrists down to the bone.  His ankles. And so that, I don't know whether there was expertise that tied the two together, that his immaturity resulted from his first three and a half years. Yes, that was the implication in the district court, that it had a definite effect. That and some of the . . . What I want to know is what the evidence was before the district court in terms of his immaturity. There was, at sentencing, they did talk about, and I think . . . No, not what they talked about. They presented an expert report. Parents did say things. Yes. Was there an expert report? Did they have a hearing with an expert present in the courtroom or more than one expert? I don't think the expert was present in the courtroom, but there was an expert report provided, and that made that connection. There was also his health issues that also affected his maturity and his emotional . . . Who provided the expert report? Do you know? The defense? The defense. And the judge made a finding that he was, in effect, incorrigible, correct? There was a statement to that. And he said, no matter what is done on appeal, if it comes back for resentencing, I'm going to give him life. He's going to impose the same sentence, yes. Impose the same sentence. What I want to know is whether he considered or what evidence he considered on the issue of recidivism here, given the nature of his mental state and also whether, during the period in question, but also whether recidivism was something that the judge just came up with or was there some factual basis for him to conclude that he could never be rehabilitated? I think it was just the argument from the government, Your Honor, that he could never stop. I don't think there was any evidence as to that he would, in fact, be a recidivist if he were to be let out basically before he died in jail. Yeah. I know his parents testified. I read the sentencing transcript. His parents testified that this was not, knowing his situation, that this was not something that was necessarily true, that he was incorrigible. But there was no expertise to that effect or one way or the other. No, I don't think there was any expert or any kind of evidence presented on that, Your Honor. Did the judge, apart from reaching the conclusion in his own mind that this individual would recidivate, was incapable of being . . . incapable of rehabilitation, did the judge buttress that with anything, any kind of findings or conclusions or factual basis? No, Your Honor. I think they were all basically conclusory statements given by the district court. The district court also failed to give us specific reasons why it was imposing that specific sentence, which was required whether what he did was a variance or not, and we would quarrel with the fact that it really wasn't a variance. Leaving aside the guidelines, I'm not talking about the guidelines. I'm talking about how he reached the sentence. I mean the substantive unreasonableness question is really whether the sentence was shockingly high, but there's also a procedural component, it seems to me, which is what was the basis for his conclusion that the only sentence that could be imposed here was effectively life? That's . . . I don't think there is anything that would support that conclusion from the district court, and certainly I don't think the district court made any specific findings or had any basis to support a conclusion that completing capacitation of this . . . Well, he put a basis on the fact that he was a judge imposing sentence. He had some discretion, and he was using his judgment to impose the sentence, but the question I have is really whether every judge would . . . most judges would come to the same conclusion based upon the nature of the criminal activity. How is this criminal activity less serious than other crimes for which he might have gotten a lower sentence? I think even if you compare it to other producers of child pornography, I mean this criminal activity was . . . there was no physical contact. He was never in the same room as any of the victims, never even in the same building. So there was no physical contact with the victims. He was never in the same room with them, much less enticing them to have sex with him . . . That's correct. . . . to meet with him in some way. This was all done on the computer. Yes, the process was probably the least offensive type of production. Also, the material produced is probably, in 20 years of doing this, probably the least offensive type of child pornography, if you can call it. So there was no sexual acts as such? None at all, Your Honor. Not being shown. Mr. Lopez, before you sit down, I had a couple of questions I wanted to ask you. I had an idea that maybe some of these 252 pseudo counts that I think . . . this is how you refer to them. Some of those were from the time when your client was a minor. But you've just said something that makes me think maybe that I was wrong about that. Is that . . . Again, there's some . . . I think it was the government, too, who talked about his being 16 when he was doing some of this. So do you think some of this 139-year sentence was based on conduct while Mr. Killen was a minor? That's possible, based on the government statement. Okay. Can I . . . You're more familiar with the type of practices that go on here in the district court in Miami than I am. Is a 139-year sentence for a 25 . . . Was your client 25 when he was sentenced? It was 22, Your Honor. 22? Yes. Okay. Is that something you would expect across the board in the Southern District of Florida, or is that . . . Not at all, Your Honor. In fact, in the section where we argue that it is, in fact, an unconstitutional sentence, I do talk about specific statistics within the Southern District of Florida and nationally that demonstrate how this sentence is just shockingly unproportional. And the government hasn't . . . This is an unprecedented case. The government hasn't even been able to find a case that is anywhere similar. And I point out in my reply brief how this is different. It's not Sarah's, where somebody was raping a stepdaughter. An older man was raping her stepdaughter. It's not Johnson, where you had somebody raping an eight-year-old boy for six years and then handing him out to other people to do the same. This is a case that is just unprecedented. The age, first-time offender, the fact that there were all these maturity and health issues, the fact that it was a nonviolent offense, no contact, all of that is just unprecedented. And then to give what the Supreme Court has labeled the second harshest penalty available in criminal law is just shocking. And I know I'm way past my time, but if I could just . . . A quick point on the suppression issue. Before you turn to that, Mr. Lopez, let me ask you one more question about the sentencing hearing. What sentence did you ask the district judge to impose? I believe, yeah, defense counsel requested a 15-year sentence, which would have been the mandatory minimum. Fifteen or fifty? Fifteen. Fifteen. Total. That was the mandatory minimum. That's correct, mandatory minimum for three of the offenses. You were not the trial counselor. I was not, Your Honor. And just very briefly, on the suppression issue, because I think the magistrate judge really did improperly and erroneously apply precedent, and just two of the factors that she misapplied those. One of them was the coercive police procedures, and we talk about the SWAT comment. She really kind of focused on the way that that statement was made, but a threat doesn't have to be made in a threatening way in order to be threatening. In this case, it was a threat, and it worked. It caused the defender's mother to then tell him to go ahead and give the government everything they wanted, and that was before he had given any consent. Importantly on that, the magistrate judge flipped the burden of proof. She said she was finding that factor in favor of the government because the defense had not cited any case law that would demonstrate that it was a coercive procedure, so that was erroneous. And also on the last factor, the case law says that that's a significant factor. It's the only factor that the case law cites as being significant. That's whether he believes that any incriminating evidence will be found, and she didn't find that in the defense favor where the facts were clear that he knew evidence would be found. And I appreciate the extra time if the court has no other questions. Well, you've reserved some time for rebuttal, so we'll hear from you again. Thank you very much. Good morning. Good morning. May it please the court, Jason Wu on behalf of the United States. With me at council table is Rob Emery, who tried the case. This case is about a serial predator, serial sexual predator, who victimized hundreds of victims, who was caught by a properly conducted investigation, who was tried, convicted after a fair trial, and who was sentenced reasonably. I get that Mr. Killen disagrees with just about everything I just said. That seems to be the central question that we're dealing with here. Right. So I'd like to turn first to the last thing I mentioned, which is that Mr. Killen was sentenced reasonably. Let me ask you one thing before you start, and then I won't interrupt you in your narrative. What sentence did the government request from the district judge? The government requested the advisory guideline sentence, which was not a range. It was just 274 years, the 3,688 months, I believe. So I would like to address that, Your Honor. The guideline range cannot be that, though, right? The guideline range would be the maximum the guidelines provide for his life. Correct. So I think actually I don't think I disagree with defense counsel on this. As we were trying to explain, there are sort of multiple components to this. Initially you have a range that's produced by the offense level combined with the criminal history category, which we're all familiar with. It was 43 and 1 in this case, which produces an initial advisory guidelines range of life, life imprisonment. However, there's a separate part of the guidelines which dictates what should happen when you have counts whose maximums are below the advisory guidelines produced by the offense level and the criminal history category. Then you have discretion to run sentences consecutively to reach the advisory guideline range, correct? Correct, just like a district judge, of course, has discretion in any sentencing matter. But not to exceed the advisory guideline range. As a matter of fact, there's a federal law that says that sentences are to run imposed at the same time for different offenses are to run concurrently unless the court orders differently or the statute mandates that the terms are to run consecutively. That's 18 U.S.C. 3584C or 8, right? Correct. So essentially that statute provides the district court with the discretion to go with either concurrent or consecutive sentences. And then, of course, the district court should consider, in addition to what the statutes provide, what the guidelines recommend or advise. So our position would be that 5G 1.2D is an advisory statement by the guidelines saying that in cases where the statutory maximum are below the otherwise applicable advisory guidelines range of life, the district court is actually advised that they should run them consecutively unless there's a reason to do otherwise. And, again, I don't think we disagree on this. I think our understanding is that the consecutive provision applies in this case and, therefore, the advisory guidelines, including 5G 1.2, was the 3,288 months. Apart from the 3,288 months, which would be a rather extensive sentence for anyone, 274 years, effectively what we're talking about here is a range of 15 years to life, correct? Correct, given the mandatory minimum, yes. And the judge had discretion in finding variances and however the judge wished to work within that range. Correct. And, in fact, the judge did give a substantial downward variance in this case. Well, he gave a substantial downward variance from life to life, 274 to 139. Working within the confines of the guidelines, correct? Yes. So understanding that they had to be stacked consecutively, he then cut, for instance, some of the 30 years there, right, as we mentioned. That's small consolation to the defendant. Fair enough. I appreciate that. But, nonetheless, it is a downward variance. It's not just a small consolation. It's practically irrelevant. I actually disagree with that, Your Honor, for several reasons. I think the first is that- If you decide you're going to sentence someone to life plus 50 and then you decide, you know, I'm going to be a little lenient here and I'm going to sentence you to life plus 30, that's a practically insignificant difference, is it not? I grant you the point from the perspective of the defendant alone. But, of course, the point of sentencing- From anybody's perspective. Well, I- The government doesn't think he's going to live to life plus 50, right? Correct. Or life plus 20. But given the overall objectives of sentencing, which include general deterrence and just sort of- That's a different question. Something that's proportionate to that. You're defending the reasonableness of the sentence. I'm asking you a different question. Calling the sentence that the judge imposed a downward variance was not accurate in all practical terms. From the perspective of the defendant, it has little practical effect. You would have said the same thing if he had departed down to 241 years. You would have said downward variance. Correct. Because it implicates the other motivations of sentencing, general deterrence and creating a sentence that's proportional to the criminal conduct. So here the district court looked at the conduct, balanced out any mitigating factors. And, for instance, on the 30-year maximum counts, he cut those in half. Mr. Killen got 15 years on each of those counts. But he ran them all consecutive. As he was advised to do or recommended to do by 5G 1.2. Why was it appropriate in this case, since the guidelines are indeed advisory, why was it appropriate in this case, given the host of circumstances both pro and con to Mr. Killen, to run everything consecutive? So that just goes back to the 18 U.S.C. 3553 factors. Of course, one of those factors is what the guidelines advise or recommend you to do. So I think we should accept that factor weighs in favor of the government, because the guidelines in fact advise that these should be run consecutively, given that the maximum term is life. That's one factor. The other factors include the offense conduct itself. And, in fact, not just the offense conduct, but the relevant conduct surrounding it. As the government demonstrated at sentencing, Mr. Killen had victimized 288 minors. That was a very conservative number. And we can talk more in detail about why that was a conservative number. But that was established at sentencing. 288 minors in a period of about two years. Not only that, but, of course, the severity of the conduct itself, I think, is somewhat understated by that. Was he victimizing all of them? And I don't want to minimize the severity of his conduct, but was he victimizing all of them in the same way? In other words, not only was he obtaining the photographs and the images and then distributing them and trading them and the like, but was he involved in the extortion side of the offense for all 280-something of these minors? Not for all 288. Essentially he had a variety of tactics. You could call it the carrot and the stick. The carrot was that he imitated or pretended to be young women. And he would essentially offer a trade, right? Nude images or provocative images of the young woman that he supposedly was in exchange for images of the young men. Sometimes that worked, in which case he did not need to bring out the threats, the stick. When it didn't work or when he was dissatisfied with what he had received, he often then did resort to the threat, which was give me more images, give me them the way I want them, or I'll publish your images to social media. And that's why I say the threat should not be minimized here as something that is harmless or silly or something that young people do. I mean, particularly in these cases, given the risk of self-harm or suicide by the victims, given the lasting emotional impact, which was even a test. I don't think anybody is minimizing the seriousness of this offense. You know, I mean, there were a great number of victims. He did use the extortion approach. He was remorseless at sentencing, apparently. He was obstructive at sentencing. He didn't, you know, he did not comport himself well. All of that. Correct. So he gets life without parole at the age of 22 for crimes committed, I take it, between teenage years and up to the age of 19, correct? Including the age of 20. So I believe Mr. Killen was born in May 1993. Up to the age of 20. Correct. Now, I don't know what the sentence is for homicide other than, you know, intentional murder here or rape or crimes of that sort. Often they're met with a severe sentence of 25 to 30 years, something of that sort. This was life without parole against a person who had real maturity problems, had been tied down in an orphanage from ages three up until he was three and a half years old. And the judge found that he was likely to recidivate, and that's why he gave him life and would give him life if he got the case back on remand for sentencing. And yet the judge did not rely on any outside expertise on whether this particular defendant was, given his psychological condition, his time in the orphanage, his admitted on all sides of his immaturity, was likely to recidivate once he matured. And that some sort of rehabilitation would never work for this person. You know, I think this is an unusual case. It's undoubtedly an unusual case, but I would point out, first of all, as to your question about recidivism, which you've asked both of us, there's a critical fact in this record which goes to that point, which is that the defendant actually had a chance to stop, as we know in the procedural history of this case. The FBI come speak to him, obtain his devices in February 2014. But his level of maturity had not changed, apparently. I mean, it appears to be. Because even at sentencing, he was behaving like he was a sort of a crazy teenager. I take the point, Your Honor, but I just want to point out what the judge had before him at the time. Because he's not making this decision purely based on his own view of child pornography cases or defendants in general. He had specific facts about this defendant, which include the fact that he had a chance to stop when the FBI came and essentially found out his conduct in February 2014. That's not what he did. Mr. Wu, as I understand it, some of these 252 victims that were named in the pre-sentence report, some of those were from a time when Mr. Killen was a minor. Is that right? I actually apologize. I don't know for sure. I would be surprised if that were true, given that they were treated as pseudo counts, which would imply that they were criminal conduct. But you were saying that he started this when he was 16. I mean, isn't that your version? I believe that was the representation made by my friend there. No, that's not what he said. I thought that was what you said. Or that's the position that the government took. The government's position was that the conduct relevant to the pseudo counts occurred between 18 and 20. It was from the data that was lifted from his computer that reflected backups in that time. And I'll note as to that, more importantly, it's irrelevant. Mr. Killen's offense level without a single pseudo count was 45. Let me ask. I have a record question. I'm afraid I'm not going to get to ask you, so I'm going to jump in. The KIC records, I know that they included some screenshots. Correct. The records that you got from Canada, did they include the actual chats? I'm glad you asked that, Judge Martin. They did not. So this goes to part of my point about why we have a very incomplete set of Mr. Killen's victims in this case, is because a large portion of the records are from the company directly. They did not store the chats. They only stored images and metadata. So in other words, we do not know what Mr. Killen said to many of these people, and we do not know what they said to him. So in other words, it's difficult to know whether, in fact, he extorted them or induced them through promises, etc. What we have, and already there are so many victims, are the chats that were stored on his computer. So in other words, when he plugs his phone into his computer, it backs up his KIC records. And that backup is more complete. It includes not only images, but the text. So the stuff you got from Canada basically just showed you who he contacted and when. Correct. Correct. And I just want to point out, this again goes to the idea of recidivism and the severity and sort of remorseless nature of this conduct. So one of those KIC backups, the one that actually generated these specific counts where he extorted three minors, it was from a 17-day period between August and September 2014. In 17 days, he did this to 47 minors. That's in the sentencing transcript record. And I think that just goes to demonstrate this is something that essentially is an addiction or an obsession of this person, something that he could not stop, even when caught by the government in February 2014. He did it. If anything, he escalated his conduct by the time the search was conducted in March 2015. So these are the factors that were in addition. But normally recidivism isn't a backward-looking determination, right? You're looking to see whether or not, with a stiff sentence and possibly with treatment, whether the person, if and when released, is likely to commit that crime or a similar crime in the future. I mean, if you use recidivism in a backward-looking way, everybody who was involved in a scheme, or almost everybody who was involved in a scheme, would recidivate. I take your point. Because they were doing it for four years, and so they didn't stop for four years, so they're going to recidivate. That's not the way you look at that issue normally, is it? In this case, it's particularly relevant because it's not the typical case where criminal conduct continues unabated, but also undiscovered and uninvestigated. I grant your point. It's not fair to say that someone's going to recidivate because they dealt drugs for four years, during which time they were never stopped or warned or advised by anyone that this was not acceptable. That's not what we have in this case. We have someone who was stopped, caught in February 2014, advised that he had to stop this. As the record of the suppression hearing shows, his parents even sent an email to the FBI agents suggesting that they would take him to a psychologist and try to work on this. A year later, they're back in the same place. If anything, there were more child pornographic images on the devices that he had replaced than the ones that they had caught him with in February 2014. I recognize I'm out of time. I would like to say one or two things on the suppression issue, if I could. My colleague mentioned the notion of coercive police procedures in this case. As to that, a few points. The first is that... I thought you said one or two points. Fair enough. I'll make two points. It's a totality of the circumstances test, and that's exactly what the magistrate judge took into consideration when considering whether this was coercive. The factors not mentioned by my colleague were the fact that the officers were invited into the home. They never said that people were not free to leave. There was no physical contact or restraint. Guns were not drawn. The conversation took place in an ordinary conversational tone. These were all credibility findings that were made by the magistrate judge. In fact, they even let him go to his room by himself to check on his phone, to get it charged, and that kind of thing. Correct. Exactly. The second point I would make as to this notion of burden shifting is that the court did not shift the burden onto the defendant to prove the absence of coercion. The court plainly put the burden where it belonged, which was the government, in the factual setting. The witnesses came. The court made the factual findings that supported the government's position. The only point in the line that was cited by defense counsel is that the court could not locate, nor did any of the parties identify, case law that would suggest that a single isolated comment automatically transforms an otherwise consensual noncustodial encounter into a custodial one. And that's not burden shifting. That's just discussion of conclusions of law. Thank you, Mr. Wood. First, I'd like to talk about this notion of variance, and I agree with Judge Jordan that this was not a variance, but not only just for practical reasons, but for legal reasons. Following Gall and Rita and all their progeny, what a variance is is when a district court imposes a sentence that is outside what otherwise would have been the applicable sentencing guideline range. So if the district court had imposed a sentence that was not within the life range, that would have been a variance. Here, really, technically, and it may sound a little absurd, it's a within-range decision. And under 3553C, the district court was then required to give specific reasons why it chose that specific sentence. It didn't. If you look at the statement of reasons from the district court, there's nothing there. He checked off a couple boxes and said that the sentence was not greater than necessary. It did not comply with 3553C. Basically, Mr. Emery requested a 274-year life sentence, and the district court imposed a 139-year life sentence. They were both life sentences. And 135-year difference between the two of them is greater than 24 months, which kicks in 3553C, which requires the district court to give specific reasons. In the Eleventh Circuit, I understand that there is a presumption of reasonableness if a sentence is within the guidelines. Is that correct? No, it is a presumption. It's not ipsy-dixit. Yes, we will quarrel with that presumption as to whether it follows Supreme Court precedent. No, no, no, no, no, no. He's talking about a general rule. I think there has been a holding here in this circuit. Some circuits don't have it. The Second Circuit doesn't have it. We've said in the Second Circuit that most sentences that are within the guideline range will be comfortable with their reasonableness. But not all. And I assume that a presumption is just that. It's a presumption that can be rebutted. Is that fair to say? Off the top of my head, I can't recall that case, and I don't think the government decided it. The language that comes to my mind is that we – I think the language from the opinion is we generally expect sentences within the guideline range to be reasonable. But I don't know that we've ever used the word presumption. I hate to answer your question. We danced on the head of the proverbial pin. And I just want to – a quick point on the recidivist point. After the agents came and took away Mr. Patrick's computer, when they came back, he did have another computer. Actually, it was an older computer. But there was no evidence that he went back to his kick meeting boys and asking them for these images. None of that. What happened was he was involved, for lack of a better word, with this very graphic child pornographer in Italy, Karasum. That's the only other person that he ever – that was ever – any evidence that he ever traded anything with was this guy Karasum. And what they found on the computer was stuff that Karasum had given to him. It was graphic stuff. I'll grant you that. But there is no evidence that he went back to this, I'm getting back on kick and getting these boys. There was no evidence that he went back to that. He kept his – he shouldn't have. Maybe his maturity issues were what issues. He went back dealing with this character Karasum and got some child pornography from them but did not go back to the same. I'm way past my time, unless the court has other questions. I would, again, just implore the court to reverse the convictions, but at the very least vacate the sentence and remand it to a different court judge, different district court judge, so that Mr. Killen can have a just and fair sentencing. Thank you. Thank you, Mr. Lopez. Appreciate the argument.